IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MARILYN K. HOWARD,
  Plaintiff,

v.         Case No. 3:11cv129/RV/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
  Defendant.

_____

REPORT AND RECOMMENDATION

  This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v.  The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34.

  Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, should be affirmed, and the application for benefits denied.

## PROCEDURAL HISTORY

Marilyn K. Howard (who will be referred to by name, as plaintiff, or as claimant) originally filed an application for disability insurance benefits ("DIB") in 2002, T. 70-73, 87[1], alleging disability due to a brain injury. T. 78. Claimant's date last insured ("DLI") for the purpose of DIB, or the date by which her disability must have commenced in order to receive benefits, was December 31, 2001. T. 24, 73.

Ms. Howard's initial application for benefits was denied in May 2003, T. 51, as was her request for reconsideration. T. 56. Following these denials, claimant requested an administrative hearing. T. 58. Neither Ms. Howard nor her representative attended the scheduled hearing in 2005, and the ALJ dismissed the request for a hearing, leaving the original denial of claimant's application intact. T. 302-03. Ms. Howard filed a second application for DIB in August 2006. T. 370-71. Claimant's application was denied again initially and upon reconsideration. T. 304, 322. Ms. Howard requested an administrative hearing and one was held in December 2008. T. 24. In a decision dated April 16, 2009, the ALJ granted Ms. Howard's request to reopen her 2002 application, but found she was not disabled within the meaning of the Act prior to the DLI. T. 21-39. The Social Security Appeals Council denied claimant's request for review, making the ALJ's decision the Commissioner's final decision. T. 10. Plaintiff now seeks judicial review of the Commissioner's decision, arguing that "the ALJ erred in rejecting the opinions of multiple treating and examining medical sources, and in adopting the opinion of the non-examining

---

[1] The administrative record, as filed by the Commissioner, consists of four volumes (docs. 20-1 through doc. 20-4), and has 524 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

source."[2]  (Doc. 24, p. 13).

## FINDINGS OF THE ALJ

In a written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2001.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 17, 1998, through her date last insured of December 31, 2001.

3.  Through the date last insured, the claimant had the following severe impairments: partial palsy of the left third cranial nerve, headaches and a cognitive disorder (frontal lobe pathology) status-post closed head injury, and left orbital fracture with left craniotomy and facial reconstruction (November 1998).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through the date last insured, the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she was restricted to simple, repetitive tasks and precluded from completing complex or multi-task type work directives and that she needed to avoid work around

---

[2]  Ms. Howard's brief concentrates only on the ALJ's findings concerning her mental impairment, though there are also complaints of back and upper extremity pain in her medical record.  *E.g.*, T. 102, 116, 231, 387.  Claimant's brief also discusses whether remand or an award of benefits is the appropriate remedy if the ALJ's decision is found to be unsupported by substantial evidence.  (Doc. 24, pp. 22-23).  The ALJ's decision is found to be supported by substantial evidence, so discussion of which remedy is appropriate is not necessary.

moving machinery and at unprotected heights and avoid more than occasional ladder climbing.

6.  Through the date last insured, the claimant was unable to perform any past relevant work.

7.  The claimant was born on October 6, 1950, and was 51 years old, which is defined as an individual closely approaching advanced age 50-54, on the date last insured.

8.   The claimant has at least a high school education and is able to communicate in English.

10.  Through the date last insured, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from November 17, 1998, the alleged onset date, through December 31, 2001, the date last insured.  T.  21-39 (bold in original; some citation references deleted).

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a

reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986) (*quoting Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985)).  The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record."[3] *Flynn*, 768 F.2d. at 1273; *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).  The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

---

[3] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.  Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her

from performing her past work.  *See* 20 C.F.R. § 404.1512.  The Eleventh Circuit has explained the operation of step five:

> In practice, the burden temporarily shifts at step five to the Commissioner.  The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that [she] is unable to perform the jobs that the Commissioner lists.  The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.  *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is generally where the rubber meets the road.  At that point, the ALJ formulates the all-important RFC.  Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that RFC.  The ALJ establishes RFC, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  RFC is then used by the ALJ to make the ultimate vocational determination required by step five.[4]  "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[5]  20

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

[5] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

C.F.R. § 404.1545(1).

FACT BACKGROUND AND MEDICAL HISTORY[6]

Marilyn K. Howard, born on October 6, 1950, was forty-eight years old at the alleged onset of disability.  T. 70.  Ms. Howard speaks English, T. 77, and has completed high school and attended some college courses.  T. 84.  She alleges disability due to a head injury that resulted in a cognitive disorder, anxiety, depression, and mood dysregulation.  (Doc. 24, p. 13-22).  Claimant's DLI is December 31, 2001.  T. 73, 322.  Her past relevant work includes positions as a bookkeeper, administrative assistant, office manager, para-professional, and data entry clerk.  T. 90.

On November 17, 1998, claimant sustained a head injury in a bicycle accident. T. 369.  She was awake when she arrived at the hospital but was confused and

---

(3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[6] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

disoriented.  T. 124, 126.  She was admitted to the hospital with diagnoses of closed head injury, left orbital tripod fracture, left orbital floor fracture, left upper eyelid laceration, left cranial nerve III palsy, and left optic nerve contusion.  T. 122.  To treat these injuries, Lynn Gaufin, M.D., performed a left craniotomy with optic nerve decompression, and Todd Engen, M.D., performed a left tripod reduction and stabilization, a left orbital floor fracture reduction, and a left upper eyelid laceration repair.  T. 122.  Claimant was discharged from the hospital in good condition on November 20, 1998.  T. 123.

On December 16, 1998 Ms. Howard attended a follow-up appointment with Dr. Gaufin.  T. 424.  Dr. Gaufin reported claimant's thinking was improving and claimant was able to discuss instructions for running a computer program over the phone in Spanish.  T. 424.  On March 10, 1999, Ms. Howard had another follow-up appointment with Dr. Gaufin.  T. 170.  Dr. Gaufin noted claimant's post-surgery recovery was going well, but there was still some cognitive impairment.  T. 170.  Dr. Gaufin further noted that Ms. Howard "has to be real careful.  For the most part she looks like she's thinking properly and doing things right, but sometimes both she and her husband are aware that her judgment or insight may be altered."  T. 170.  In an August 23, 1999, follow-up with Dr. Gaufin's office, claimant reported symptoms of anxiety and problems with cursing but also that "her brain is working a lot better."  T. 169.

At Dr. Gaufin's request, Erin Bigler, Ph.D., performed a neuropsychological examination of Ms. Howard on May 4, 1999.  T. 156, 171.  Dr. Bigler conducted testing and concluded claimant had mild deficits in executive functioning with

associated anxiety and distress.[7]  T. 159.  Dr. Bigler noted difficulty with speed of processing and attention/concentration.  T. 155.  At that time, Dr. Bigler felt Ms. Howard's problems could be treated with cognitive rehabilitation therapy and a biofeedback treatment program that focused on stress and anxiety management.  T. 155.

Judith Moore, D.O., wrote a letter on October 26, 1999, summarizing her treatment of Ms. Howard from April 29, to August 31, 1999.  T. 172.  Dr. Moore reported claimant complained of "headaches, third nerve palsy with double vision, and mental symptoms such as poor short-term memory, difficulty concentrating and difficulty reading and comprehending."  T. 172.  Dr. Moore performed osteopathic cranial manipulation on Ms. Howard with some success but noted claimant experienced a worsening of symptoms around July 27, 1999.  T. 172.

On October 4, 2000, Ms. Howard began seeing Dr. Richard Armond for a continuation of the osteopathic manipulation treatment she had received from Dr. Moore.  T. 184, 423.  In the patient health history form, Ms. Howard reported depression and anxiety attacks.  T. 186.  Dr. Armond's notes also reveal claimant reported an increase in her mood swings and depression following an incident on December 25, 2000, where she hit her head on a freezer door.  T. 196.  In subsequent appointments, Ms. Howard reported she was doing better and made no further complaints of mood swings or depression.  T. 190, 192, 193.

In May 2001, Susan Addison, Ph.D., provided neuro-linguistic programming

---

[7] At the ALJ hearing, the medical expert, Dr. Griffin, described executive functioning as "the ability to take different bits of information, put them together, [and] come up with a conclusion or plan. . . . Things like balancing a checkbook, paying bills, maintaining the household, organizing the household[.]"  T. 480.

therapy to Ms. Howard on a referral from Dr. Armond.  T. 189.  This therapy was performed in two sessions.  T. 189.  Dr. Addison noted the therapy produced good results, decreasing Ms. Howard's anxiety and improving her outlook and ability to cope.  T. 189.

Ms. Howard received general medical care from Dennis W. Remington, M.D., from 1993 to 2002.  T. 213-16.  In April 1999, Dr. Remington reported complaints of mood swings.  T. 215.  On April 3, 2002, Ms. Howard reported to Dr. Remington that her anxiety was only moderately troublesome and her depression was only mildly troublesome.  T. 218.  Subsequently, Ms. Howard reported to Dr. Remington that her mood swings and depression had decreased and that she had been travelling.  T. 213. Dr. Remington did not recommend any treatment or prescribe any medication for claimant's mental condition.

Ms. Howard received treatment from Jason Thackeray, M.D., in October of 2002.  T. 228-31.  Dr. Thackeray provided treatment for complaints of shoulder pain. Dr. Thackeray did not note any complaints of anxiety or depression.  He did note that Ms. Howard indicated she was employed doing consultations.  T. 231.

On August 20, 2003, a Psychiatric Review Technique was completed by Jane Cormier, Ph.D. T. 249-62.  After reviewing Ms. Howard's medical files, Dr. Cormier concluded that insufficient evidence existed in the record to allow for adequate assessment of claimant's mental impairments.  T. 261.  On October 9, 2003, J. Patrick Peterson, Ph.D., also completed a Psychiatric Review Technique.  T. 263-276.  Upon review of Ms. Howard's medical record, Dr. Peterson concluded claimant had no medically determinable mental impairments.  T. 263.  Dr. Peterson based his conclusion on the fact Ms. Howard had performed well on the 1999

neuropsychological testing and on the fact she continued to perform all her ADLs capably.  T. 275.

James Snyder, Ph.D., performed a neuropsychological examination of Ms. Howard on December 15, 2006.  T. 414.  Dr. Snyder performed a number of tests on claimant and found mild impairment in visual and auditory attention and concentration.  T. 419.  He noted Ms. Howard showed some areas of improvement from the 1999 neuropsychological examination but found her organic mood regulation showed significant deterioration, resulting in panic attacks and suicidal ideation.  T. 419-20.  Based on his neuropsychological evaluation, Dr. Snyder opined that claimant was disabled and her mental limitations extended back to 1998.  T. 393-96.

On November 30, 2007, Brent Decker, Ph.D., issued a report summarizing three psychological evaluation sessions he had with Ms. Howard.  T. 398.  The results of the evaluations showed claimant performed in the average range in terms of intellectual functioning and had only mild cognitive impairment.  T. 401-04.  Ms. Howard reported that she had mild to moderate levels of emotional distress.  T. 405.  Claimant also reported she had thought about killing herself, but did not believe she would carry this out.  T. 406.  Dr. Decker concluded Ms. Howard had some difficulties with short term memory and cognitive functioning related to her inability to stay focused and concentrate.  T. 407.  He noted that she presented moderate levels of depression and had some difficulty with tasks of daily functioning.  T. 407.  He found these problems would make it challenging for her to seek employment.  T. 407.  To address these problems, Dr. Decker recommended therapy and medication.  T. 407.

Dr. Bigler wrote two letters after the DLI regarding Ms. Howard's mental condition.  T. 392, 520.  In the first, composed on May 19, 2005, Dr. Bigler noted he had not seen Ms. Howard since his 1999 neuropsychological evaluation, but offered his opinion that she was disabled in 1999 based on deficits in executive function revealed by his evaluation.  T. 520.  The second letter, written on December 18, 2007, reiterated his belief that Ms. Howard was disabled but was also based on the neuropsychological evaluation performed by Dr. Snyder in December 2006, with which Dr. Bigler fully concurred.  T. 392.  Dr. Bigler opined that claimant suffered from mood dysregulation, anxiety, and changes in personality and cognitive function.  T. 392.  He noted there were treatment options available, but they were unlikely to return Ms. Howard to her prior baseline of functioning.  T. 392.

Rhonda Adkinson, Psy.D., conducted a psychological evaluation of Ms. Howard in October 2008.   T. 452-55.   After reviewing Dr. Snyder's neuropsychological evaluation and examining claimant for four hours, Dr. Adkinson diagnosed Ms. Howard with a Chronic Adjustment Disorder, with Mixed Anxiety and Depressed Mood.  T. 452.  Based on this diagnosis, Dr. Adkinson believed that Ms. Howard would not be able to hold gainful employment at any future date.  T. 452.

<u>HEARING BEFORE THE ALJ</u>

Ms. Howard's administrative hearing took place on December 2, 2008.  T. 462.  In consultation with her attorney, Thomas Furr, Ms. Howard chose not to attend the hearing because of her mental disorders.  T. 466.  In addition to Mr. Furr, Medical Expert Edward Griffin, M.D., and Vocational Expert Charles Heartsill, were also present at the hearing.  T. 462.  The ALJ asked Dr. Griffin, based on a review of Ms. Howard's medical records, to offer his opinion of her condition as of December 31,

2001.  T. 470.  Dr. Griffin noted claimant had headaches, and partial palsy to the left third cranial nerve that limited her field of vision and caused photosensitivity.  T. 470-71.  Dr. Griffin next discussed the symptoms of plaintiff's frontal lobe pathology.  He noted that she presented with mood instability but tended to do well on IQ tests.  T. 472.  Dr. Griffin also noted inconsistencies in Ms.  Howard's claims of attempted suicide.  T. 472.  He opined claimant would have some problems with attentiveness and perhaps interaction with the public or supervisors.  T. 472.  Dr. Griffin opined that Ms. Howard's condition could have been improved with a mood stabilizer.  T. 473. Dr. Griffin concluded that Ms. Howard would have no physical limitations other than those caused by the condition of her left eye.  T. 481-82.  Dr. Griffin opined that, because of the left eye, Ms. Howard should not work around moving machinery or unprotected heights, and only occasionally climb ladders.  T. 484.  Despite the mental impairments, Dr. Griffin felt Ms. Howard retained the capacity to perform simple, rote, repetitive tasks.  T. 484.

Next, the ALJ questioned the vocational expert, Charles Heartsill.  T. 504.  The ALJ asked Mr. Heartsill if a person could perform any of Ms. Howard's past relevant work if they had the following limitations: inability to work around moving machinery or heights, ability to climb ladders only occasionally, ability to perform only simple repetitive tasks, inability to look up with her left eye, and inability to work in bright environments due to photosensitivity.  T. 508-09.  Mr. Heartsill reported such a person would not be able to perform any of Ms. Howard's past relevant work.  T. 509.  He did find, however, such a person would be able to perform work as ticketer, ticket taker, addresser, order caller, and route clerk.  T. 509-10.  Ms. Howard's attorney, Thomas Furr, then asked Mr. Heartsill whether a person would

be able to perform any work if they had the following: marked limitations accepting instructions and responding to criticism from supervisors; marked limitations in the ability to respond to work pressures, respond to changes in work routine, and perform activities at a consistent pace; and marked limitations in the ability to respond appropriately to the pressures of daily living.  T. 512.  Mr. Heartsill responded that such a person could not perform any of the jobs previously mentioned.  T. 512.

## ANALYSIS

Ms. Howard's appeal asserts "the ALJ erred in rejecting the opinions of multiple treating and examining sources, and in adopting the opinion of the non-examining source."  (Doc. 24, p. 13).  A discussion of the ALJ's decision to reject claimant's treating physicians will begin this section, followed by a brief discussion of the ALJ's decision to rely on Dr. Griffin, the medical expert at the hearing.

Treating physician testimony must be given substantial weight unless good cause is shown to the contrary.  *Lewis v. Callahan*, 125 F.3d 1435, 1440 (11th Cir. 1997).  "Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis*, 125 F.3d at 1440.

Ms. Howard's DLI was December 31, 2001.  T. 26, 73.  She has the burden of establishing she was disabled prior to her DLI.  *See Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 831 (11th Cir. 2001) ("DIB applicants must show that they were disabled on or before their last-insured date." (*citing Moore v. Barnhart*, 405 F.3d

1208, 1211 (11th Cir. 2005))); *see also* 20 C.F.R. § 404.1512(c) ("[Claimant's] responsibility.  [Claimant] must provide medical evidence showing that [claimant has] an impairment(s) and how severe it is during the time [claimant] says that [claimant is] disabled.").  In attempting to establish her disability, Ms. Howard relies mainly on the opinions of doctors who examined claimant long after the DLI.  The ALJ must consider these retrospective opinions when determining whether a claimant is disabled, but, like any treating physician testimony, the ALJ can give the retrospective opinions no weight if there is good cause.  *See Dempsey v. Comm'r of Soc. Sec.*, 454 F. App'x 729, 733 n.7 (11th Cir. 2011) ("Absent good cause, a treating physician's opinion is entitled to substantial weight even if the physician did not treat the claimant during the relevant period of time." (*citing Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983))); *see also Garvey v. Astrue*, No. 1:07-cv-00021-MP-WCS, 2007 WL 4403525, at *7 (N.D. Fla. Dec. 12, 2007) (noting retrospective opinion may be discounted if not supported by the medical records from the relevant time period (*citing Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998))).

In light of these principles, Ms. Howard must establish she was disabled between November 17, 1998, the alleged disability onset date, and December 31, 2001, the DLI.  Ms. Howard relies primarily on the opinions of Drs. Bigler, Snyder, Decker, and Adkinson to support her assertion of disability due to problems with mood dysregulation, anxiety, depression, and a cognitive disorder.[8]  (Doc. 24, p. 13-

---

[8] Ms. Howard briefly mentions the failure of the ALJ to address a comment from another doctor, Lynn Gaufin, that claimant "has to be real careful.  For the most part she looks like she's thinking properly and doing things right, but sometimes . . . her judgment or insight may be altered." T. 170.  This comment neither suggests Ms. Howard is disabled nor suffices to render the ALJ's decision unsupported by substantial evidence.  This statement is consistent with the ALJ's recognition that claimant suffers from a cognitive disorder.

22).  The ALJ recognized claimant's cognitive disorder as a severe impairment but did not find that Ms. Howard's other alleged mental impairments were severe.  T. 27-32.  Of the doctors mentioned above, Dr. Bigler was the only one to examine plaintiff prior to the DLI.  T. 157-60.  Dr. Bigler, however, did not examine claimant at all after the DLI and did not opine Ms. Howard was disabled until several years after the DLI.  T. 392, 520.  As an initial matter, then, claimant's doctors' opinions do not offer a longitudinal picture of Ms. Howard's health that spans across the period of alleged disability.[9]  *See* 20 C.F.R. § 404.1527(c)(2) (2012) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed longitudinal picture of your medical impairments(s)[.]").

The ALJ considered these doctors' opinions concerning claimant's mental condition and the record as a whole and determined Ms. Howard retained the RFC to perform substantial gainful activity prior to her DLI.  T. 26-39.  The ALJ rejected the opinions of claimant's doctors because the medical record prior to the DLI showed a paucity of complaints or observations of severe mental impairments, continued

---

[9] From the record, it is unclear whether these doctors should even be accorded the status of treating physicians.  It appears Dr. Bigler only examined claimant during the 1999 neuropsychological evaluation.  T. 520.  Dr. Snyder seems to have only examined claimant during his 2006 neuropsychological evaluation of claimant.  T. 414-20.  Dr. Decker conducted only one psychological evaluation of claimant but it was completed in three separate sessions.  T. 398.  Similarly, Dr. Adkinson spent four hours evaluating claimant in 2008, but it is unclear how many days or weeks this occurred over.  T. 520.  *See Swann v. Astrue*, No. 3:07cv129/LAC/EMT, 2008 WL 818500, at *8 (N.D. Fla. March 26, 2008) ("Because much of the rationale underlying the treating physician rule involves the physician's familiarity with his patient, it does not apply to a physician who bases his opinion of a claimant's limitations upon a single visit." (*citing Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986))).  Claimant's arguments will, nevertheless, be analyzed on their merits.

performance of most ADLs, and inconsistencies in Ms. Howard's doctors' reports. The ALJ also noted an apparent worsening of claimant's condition subsequent to her DLI, and a lack of medical treatment for her allegedly disabling impairments.  T. 27-36.

As the ALJ saw it, the lack of complaints or observations of Ms. Howard's mental impairments prior to her DLI undermined the claim that she was disabled.  T. 28-30.   At times the ALJ indicates that there were no complaints of anxiety, depression, or mood dysregulation between Dr. Bigler's neuropsychological evaluation in May 1999 and the DLI in 2001.  The record, however, suggests three instances where Ms. Howard complained about her anxiety, depression, or mood swings.  The inconsistent nature and scant number of these complaints does not undermine the ALJ's assertion that these symptoms were not severe.  The first such complaint showed up in a report from Dr. Gaufin's office dated August 23, 1999, and noted that Ms. Howard  had some problems with anxiety but was still doing fairly well.  T. 169.  Ms. Howard also filled out a health history form for Dr. Armond in October 2000 and reported symptoms of depression and anxiety.  T. 186.  Another report from Dr. Armond's office on April 13, 2001 noted Ms. Howard complained of mood swings and depression.  T. 196.  In subsequent visits, however, Dr. Armond did not note any complaints of anxiety, depression, or mood swings, T. 190, 192-93.  The only treatment Dr. Armond recommended for these complaints was counseling with Dr. Addison, who reported a marked decrease in anxiety and increased ability to cope.  T. 189.  No indication of particular severity can be gleaned from these entries.  If Ms. Howard's anxiety, depression, or mood dysregulation were severe impairments prior to her DLI, one might reasonably expect consistent reports of these conditions

throughout the notes of Ms. Howard's doctors.  Dr. Moore's letter summarizing her treatment of claimant form April 1999 to August 1999 describes only complaints of headaches and mental problems related to the cognitive disorder.  T. 172.  Dr. Moore's report contains no complaints of anxiety, depression, or mood dysregulation. T. 172.  A key indication that these mental impairments were not disabling comes from a form Ms. Howard completed in 2002, shortly after the DLI.  T. 218.  On the form, Ms. Howard indicated depression was only mildly troublesome and anxiety was only moderately troublesome.  T. 218.  She also reported panic attacks were only mildly troublesome.  T. 218.  If Ms. Howard experienced these symptoms to the extent they significantly limited her ability to perform basic work activities, one would expect these would be reported as more severe.

The ALJ also supported his decision by noting that Ms. Howard continued to perform most of her ADLs.  T. 32-34.  In 2003, Ms.  Howard reported she took her mother-in-law to the doctor.  T. 106.  She also cooked for her in-laws and made sure they took the right medications.  T. 106.  Claimant reported being very active in her church, attending at least once a week, as well as performing genealogical research at the church's family history center.  T. 99.  Claimant also reported she was capable of cooking, cleaning, shopping, and managing money with supervision from her husband.  T. 98-99.  In a telephone conversation with the Social Security Administration in May 2003, claimant reported performing yard work helped calm her down. T. 105. Dr. Gaufin reported claimant was capable of discussing computer problems in Spanish only one month after her accident.  T. 424.  Dr. Thackeray reported that claimant told him she was employed doing consultations. T. 231. Ms. Howard's performance of a variety of ADLs supports the ALJ's finding that Ms.

Howard's was not disabled.

The ALJ noted several inconsistencies in Ms. Howard's treating physicians' reports that undermined their credibility.  First, Dr. Bigler's 2007 opinion that claimant was disabled claimed he "had the opportunity to evaluate, follow, and track" Ms. Howard since 1999. T. 36, 392.  The ALJ noted, however, Dr. Bigler had not actually seen claimant at all since the 1999 neuropsychological evaluation.  T. 383. It appears Dr. Bigler relied on the more recent neuropsychological evaluation performed by Dr. Snyder in 2006 to form his opinion that Ms. Howard was disabled, noting he fully concurred with Dr. Snyder's assessment.  T. 392.

To be sure, Drs. Snyder and Adkinson both noted Ms. Howard reported trying to kill herself on multiple occasions.  T. 415, 430.  As the ALJ observed, however, there was no evidence of emergency room visits, psychiatric inpatient treatment, or mental health treatment for these suicide attempts.  T. 30.  The ALJ also noted claimant told Dr.  Decker she had thought about killing herself but did not believe she would carry it out. T.  31, 406.  This inconsistency suggests that Ms. Howard's description of her mental condition to her doctors was not entirely credible, indicating their opinions could be based on inaccurate information.

The evidence in the medical record suggests that Ms.  Howard's condition may well have worsened after her DLI, possibly explaining why reports of claimant's condition several years after her DLI do not correspond with records prior to the DLI. The ALJ noted that a form completed on November 27, 2006, indicated that Ms. Howard's condition had worsened at the end of 2004.  T.  34, 381, 388.  The document also noted her headaches, depression, and anxiety had increased.  T. 387. Also, in a form completed sometime after September 2003, Ms. Howard indicated

that she was having increasing problems with headaches and depression. T. 115. Dr. Snyder's 2006 neuropsychological evaluation noted claimant had a "significant deterioration of organic mood regulation." T. 419. This evidence suggests that if Ms. Howard's condition matched the severity indicated by Drs. Bigler, Snyder, Decker, and Adkinson in 2005 to 2008, it reached that level after 2001, the DLI. *See Mason*, 430 F. App'x at 831 (*quoting Demandre v. Califano,* 591 F.2d 1088, 1090 (5th Cir.1979) ('If a claimant becomes disabled [after the DLI], [the] claim must be denied despite [the] disability.')).

The final reason the ALJ provided to support the finding claimant was not disabled concerned the lack of treatment Ms. Howard pursued either before or after the DLI. T. 27-31. The amount and type of treatment a claimant receives is relevant to determining the severity of a claimant's symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (2012). If Ms. Howard's problems with her cognitive disorder, anxiety, depression, and mood dysregulation were so severe as to be disabling, the ALJ reasonably noted one would expect to see regular treatment to address these problems. Yet the only evidence of treatment consists of two counseling sessions with Dr. Addison in May 2001.[10] T. 189. Dr. Addison performed neuro-linguistic programming with claimant and noted a marked decrease in anxiety and an increase in positive outlook and ability to cope. T. 189. No record appears of any other attempts to treat Ms. Howard's cognitive disorder, anxiety, depression, or mood dysregulation. Ms. Howard did receive osteopathic manipulation treatment between November 17, 1998, and December 31, 2001, from Drs. Moore and Armond,

---

[10] Claimant also reported receiving biofeedback treatment from Dr. Robert Dallas for a short time with successful results. T. 85, 103. There are, however, no notes from Dr. Dallas in the record.

but this was apparently provided to treat claimant's headaches and body pains.  T. 172, 191-211.  Ms. Howard also received general medical care from Dr. Remington prior to her DLI but there is no indication that he attempted to treat her mental impairments.  T. 213-17. The lack of treatment evidenced by the record suggests Ms. Howard's mental impairments were not disabling.

Ms. Howard's brief provides several justifications for her lack of treatment. First, plaintiff alleges treatment would not have allowed her to return to her previous functional capacity.  (Doc. 24, p. 17). In his December 2007 letter, Dr. Bigler stated, "While there are potential treatment options, I don't believe that they would allow this patient to return to [her] prior baseline level of function." T.  392.  Plaintiff relies on this statement to demonstrate that her lack of ongoing mental health treatment does not undermine her allegations.  (Doc. 24, p. 17).  Although claimant may not be able to return to her pre-accident level of functioning, this does not necessarily mean treatment would have been futile or should not have been attempted if her condition were severe.  In fact, several doctors recommended some form of treatment for claimant's condition both before and after the DLI.

Ms. Howard's brief contends that the ALJ "failed to consider the possibility that no treatment was recommended, because [p]laintiff's residual problems were not treatable." (Doc. 24, p. 18).  This assertion is belied by the record, though, because Drs. Bigler, Snyder, and Decker all recommended some form of treatment.  After the 1999 neuropsychological evaluation, Dr. Bigler recommended cognitive rehabilitation therapy and a biofeedback program.  T. 154-55, 160.  After Dr. Snyder's 2006 neuropsychological evaluation, he recommended claimant pursue a combination of medication and counseling services.  T. 420.  In his psychological

evaluation report in November 2007, Dr. Decker likewise recommended that claimant pursue a combination of medication and therapy.  T. 407.  Claimant's brief specifically notes none of Ms. Howard's doctors recommended the actual treatment Dr. Griffin advised at the administrative hearing.  (Doc. 24, p. 18).  Although Dr. Decker and Dr. Snyder did not recommend the specific drugs that Dr. Griffin did, they did recommend medication to help Ms. Howard's condition.  The fact Ms. Howard chose not to pursue any of these recommended treatments supports the inference her mental impairments were not disabling.

Ms. Howard also asserts treatment had not been effective.  (Doc. 24, p. 17-18).  A letter from Dr. Snyder in January 2008 notes that "various treatments have not been effective and Mrs. Howard remains permanently impaired."  T. 393.  Neither the letter nor medical record, however, indicate which treatments Dr. Snyder is referring to.  The only treatment for mental health detailed in the record, the counseling provided by Dr. Addison, was reported to be successful.  T. 189.

The final reason Ms. Howard offers for her failure to seek treatment is that she had trouble obtaining insurance coverage and thus could not afford treatment.  (Doc. 24, p. 19).  If the ALJ's primary basis for denying disability benefits is that the claimant failed to seek treatment and there is evidence in the record that the failure to seek treatment was predicated on a lack of money or insurance coverage, then the ALJ must determine whether the claimant had sufficient funds to receive treatment.  *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (*citing Dawkins v. Bowen*, 848 F.2d 1211, 1213-14 (11th Cir. 1988)).  Though the record does contain instances suggesting Ms. Howard had trouble obtaining insurance coverage for treatment, T. 102-03, 107, 115, 400, this was not the only basis for the ALJ's

determination claimant was not disabled.  The ALJ provided a number of reasons for finding claimant was not disabled prior to the DLI, including: the lack of observations or complaints of severe mental impairment, the continual performance of most ADLs, the inconsistencies in claimant's doctors' reports, and the apparent worsening in claimant's condition after her DLI.  Therefore, the ALJ should not be reversed for failure to specifically address the claimant's financial ability to seek treatment.[11]  *See Ellison*, 355 F.3d at 1275 (holding ALJ's failure to consider claimant's ability to afford treatment did not constitute reversible error when ALJ did not rely primarily on lack of treatment to find claimant was not disabled).

The ALJ's decision to discount the opinions of Ms. Howard's treating physicians was permissible because the doctors' opinions regarding claimant's condition were not corroborated by the medical record prior to the DLI.  The lack of observations or complaints of severe mental impairment, the continued performance of ADLs, the inconsistencies in the doctors' reports, an apparent worsening of claimant's condition after the DLI, and the claimant's lack of treatment provided substantial evidence for the ALJ to reject claimant's doctors' opinions.

The second part of claimant's argument asserts the ALJ's reliance on the testimony of the medical expert, Dr. Griffin, was improper.  Dr. Griffin testified, consistent with Dr. Bigler's 1999 and Dr. Snyder's 2006 neuropsychological evaluations, that claimant's cognitive disorder would cause some difficulties with executive functioning and therefore she should be limited to simple, rote, repetitive tasks.  T. 484-85. Griffin also noted that the condition of claimant's left eye posed

---

[11] Ms. Howard's brief devotes only one sentence to this justification for lack of treatment (Doc. 24, p. 19).

some limitations and therefore she should be precluded from work around moving machinery and unprotected heights and also should avoid more than occasional ladder climbing.   T. 482-84.   Dr. Griffin also noted that claimant had no exertional limitations. T. 481. Dr. Griffin's opinion concerning claimant's limitations prior to the DLI was corroborated by the evidence available from that time period.   Therefore, the ALJ's decision to reject the treating physician testimony and instead rely on Dr. Griffin's testimony was permissible. *See Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 902 (11th Cir. 2012) (holding ALJ did not err when he did not give treating physician opinion controlling weight, because it was unsupported by medical record, and instead chose to give significant weight to non-examining physician opinions because they were consistent with record).

Although the ALJ's decision is supported by substantial evidence, he appears to have made a slight misstatement in his analysis.   When examining the reports of Drs. Decker and Snyder, the ALJ noted that "[c]ontrary to Dr. Snyder's conclusion that the claimant had a 'permanent' short term memory impairment, Dr. Decker subsequently reported that his examination showed that the claimant experienced some improvement in intellectual and short term memory function." T. 29.  It appears this observation of improvement was actually made by Dr. Snyder and not Dr. Decker.[12]  T. 408-13.  Also, these two statements regarding Ms. Howard's condition are not necessarily mutually exclusive, as implied by the ALJ.  The report recognized improvement in claimant's short term memory between Dr. Bigler's 1999 neuropsychological evaluation and Dr. Snyder's 2006 neuropsychological evaluation.

---

[12] The report was erroneously attributed to Dr. Decker on the List of Exhibits.  T. 9.

T. 410-11.  It is certainly possible that there was improvement over that time, but that the short term memory impairment was still permanent in that it would never return to pre-accident levels.  This mistake, discovered with the luxury of appellate review of the paper record, is not significant enough to constitute reversible error, because, as noted above, the ALJ still identified substantial evidence to reject the opinion of Dr. Snyder concerning Ms. Howard's limitations prior to her DLI.  In truth, the fact that Dr. Snyder charted the improvement may provide further reason to doubt the significance of the earlier statement concerning permanent loss.

Based on the foregoing analysis, the ALJ's decision to reject the opinions of Ms. Howard's doctors, and rely on the medical expert's opinion, was supported by substantial evidence in the record.  Where, as here, the ALJ has conducted a thorough examination of the record and properly considered claimant's medical condition as a whole to reach a determination supported by substantial evidence, this court may not reverse the Commissioner's decision.  *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  It is therefore respectfully RECOMMENDED:

That the application for a period of disability and disability insurance benefits be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 16th day of July, 2012.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).